## E. Fisher et al., Appellants, v. the American Reduction Company.

*Nuisance—Garbage furnace—Injunction—Equity.*

Certain residents of a city living on a bluff filed a bill in equity against the proprietor of a garbage furnace situated on the river bank at the base of the bluff. It appeared that plaintiffs were considerably annoyed at times by the offensive odors, not given forth by the furnace itself, but which arose from the garbage before being placed in the furnace. The furnace was of the best and most approved construction. The evidence showed that other industrial establishments on the river bank contributed to some extent to the annoyance. The furnace was operated under a contract with the city, and the site of it had been selected by the city authorities. The evidence tended to show that the site was probably the best for the purpose anywhere within, or in the neighborhood of, the city. The court refused to enjoin the operation of the furnace, but decreed that the garbage should be placed in the furnace as soon as possible, and that the residuum should be shipped off as speedily as possible. *Held*, that the decree was a proper one under the circumstances.

Argued Nov. 7, 1898. Appeal, No. 146, Oct. T., 1898, by plaintiffs, from decree of C. P. No. 2, Allegheny Co., July T., 1896, No. 284, on bill in equity. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an injunction to restrain a nuisance.

The court filed the following opinion:

The bill was filed by fifty-two citizens, living on the bluff,

opposite where defendant's garbage furnace is located, against William Flinn, Philip Flinn and Charles E. Flinn, doing business as the American Reduction Company, alleging that the garbage furnace of the defendant was a public nuisance, and asking that it be prevented from continuing as a nuisance. The bill was filed in May, 1896. The answer set forth that William Flinn was not concerned in the business and had no interest whatever in it; and Philip Flinn also filed an answer denying that he had any interest whatever in it. Charles E. Flynn's answer admitted that he was the owner of the property and that he was conducting it under the name of the American Reduction Company. The evidence established the fact that William Flinn and Philip Flinn had no interest whatever in the establishment, and, therefore, the bill should be dismissed as to them.

When the case first came up before the court, the answer admitted that it had been conducted in such a negligent manner that it was substantially a nuisance to the plaintiffs in the bill; but stated that the company intended to change the mode of reducing the garbage, and would do so in such a way as not to be offensive, and the court at that time gave permission to the defendant to make the change that it contemplated, and then the question to come up. The defendant company did make certain changes in the mode of reducing the garbage and of disposing of the offensive odors or gases, and commenced business again in the summer of 1896. It is now contended by the defendant that there are no offensive odors or gases escaping from the establishment. The contention on the part of the plaintiffs, however, is that it is as bad as it was before.

### FINDINGS OF FACT.

1. The garbage furnace is located on the bank of the Monongahela river. For a distance of a mile or so along the river bank, there are no residences; it is occupied by the Baltimore & Ohio Railroad, by street car railroad tracks, and by several factories and establishments of that kind. It is a narrow strip or bank between the river and the steep bluff, that rises from 100 to 150 feet high. The plaintiffs live on that bluff.

2. The garbage furnace was constructed in 1895, under certain ordinances, and with the sanction of the city authorities.

An ordinance was passed by the city councils and approved by the mayor on January 14, 1895, in pursuance of an act of the legislature of April 12, 1872. Section 23 of that act of the legislature provided that the board of health, which is now the bureau of health, under recent acts in reference to the city, "shall have the power and authority to enter into any contract with such parties as they may think proper, for the removal of all dead animals from streets, lanes and unoccupied ground within the city of Pittsburg." Section 33 provided that the board of health was authorized "to employ from time to time as many scavengers as it may deem necessary, upon such terms and with such appliances and conveyances as it may deem expedient, and to make from time to time such rules and regulations for the conduct of such scavengers as it may deem necessary." Section 34 provided that "the board of health shall cause a printed notice to be left at each and every hotel, tavern, eating house, dwelling house in the city, stating that a scavenger will call for offal, garbage, swill—at certain times mentioned in the notice, and requiring that such offal, swill—be ready in packed tubs or other suitable vessels, for the scavenger when he calls for the same." Section 35 provided a penalty for neglect of the dwellers in those houses to provide such tubs. In pursuance of that act of the legislature, the ordinance of January 14, 1895, was passed, containing among others, these provisions :

"Section 1. That it shall be the duty of every resident, householder, tenant, hotel-keeper, boardinghouse-keeper, retail dealer and all parties or persons occupying dwellings within the city of Pittsburg, to provide, or cause to be provided, and at all times keep or cause to be kept or provided, portable vessels or tanks for holding garbage and offal;" and "all such vessels or tanks shall be promptly delivered to the collector when called for.

"Section 2. The words 'garbage and offal' as used in this ordinance shall be held to include every refuse accumulation of animal, fruit or vegetable matter, liquid or otherwise, that attends the preparation, use, cooking, dealing in or storage of meats, fish, fowls, fruits or vegetables.

"Section 3. All persons engaged in collecting and removing garbage and offal, as aforesaid, shall, for said purpose, provide themselves with iron or steel boxes or tanks, mounted on two

or four wheels, which boxes or tanks shall be made perfectly water-tight and kept so, and securely and tightly covered on top so as to prevent the contents or any odor escaping therefrom."

Section 5 was amended by the ordinance of April 8, 1895, which read as follows: "All such garbage and offal thus collected shall be conveyed by the persons so collecting it at their own cost and expense to such furnace or furnaces as shall be necessary, and to be located within the limits of said city, at such place or places as shall from time to time be designated by the director of the department of public safety, and all such offal or garbage so removed shall be disposed of at such furnace or furnaces in a proper sanitary manner."

Section 6 of the ordinance of January 14, 1895, provided: "The director of the department of public safety shall district the city of Pittsburg for the purpose of collecting and removing garbage and offal."

Section 12 provided: "The collection, removal and disposal of garbage, offal, dead animals and condemned meat, as aforesaid, shall be conducted under the supervision and control of the department of public safety and bureau of health and in strict conformity with the provisions of this ordinance, and of the additional rules and regulations made or to be made in compliance therewith."

Section 13 provided: "The director of the department of public safety is hereby authorized and empowered to make and enforce such additional rules and regulations regarding the collection, removal and disposal of garbage, offal, dead animals and condemned meat, as he may from time to time deem necessary, said rules and regulations to be subject to the approval of councils and the mayor."

"Section 15. The director of the department of public safety be and hereby is instructed and empowered to advertise for proposals, and enter into a contract for the collection, removal and disposal, of the garbage, offal, dead animals and condemned meat of the city, in accordance with the conditions, stipulations and requirements of this ordinance, such contract to be for a term not exceeding four years, and subject to the approval of the councils and mayor."

In pursuance of these ordinances a contract was made with

the defendant, Charles E. Flinn, for collecting and disposing of the garbage of the city; the factory on Second avenue was located by the director of the department of public works; the site approved by him; and in pursuance of that the garbage furnace and factory were erected. The director of the department of public safety frequently visited and inspected it, and also the officers of the bureau of health repeatedly visited and examined it, and have testified that it was in a proper location and properly conducted, and that it was not a public nuisance.

3. The plant cost, in its original construction, and in the repairs and changes that have been made, well on to $100,000. There are fourteen digesters, as they are called, in which the garbage is boiled. As originally constructed, these were not tight, and a great deal of odor and gas escaped from them. There was no mode at first of deodorizing and destroying these gases and odors; they were conducted by a pipe down towards the river, escaped, and were quite offensive, down on the river bank and up on the bluff. A change was made, by which the digesters were made air-tight, by lids on the top, after the garbage was put in, before the boiling process began; the offensive odors and gases were conducted under a vacuum to what is called an incinerating furnace, by which they were either destroyed or deodorized, the pulpy material was conducted into what is called a "dryer," and the dry residuum obtained from that dryer. At first this residuum was converted into fertilizing material at the garbage furnace, and, in the process of converting it into fertilizer, some chemicals were used, which were themselves offensive and increased the bad odors. When the change was made, in the summer of 1896, they ceased to convert this residuum into fertilizers, and obtained some place up in one of the adjoining counties to which the residuum is shipped, and there converted into fertilizers. From eighty to one hundred tons of garbage are hauled to this furnace every day, except Sunday. No garbage is hauled on Sunday, and the works are never run on the Sabbath day. About 120 barrels of the residuum are obtained every day and shipped off on the cars; no offensive vapors or gases from the digesters, during the boiling process, if kept closed, can escape into the building, and the gases conducted through the incinerating furnace are there either destroyed or deodorized, so that they are not offen-

sive, and any smells that may ascend to the bluff are not from the gases or vapor arising during the boiling process. In that respect the furnace is a success.

The operation of the work on the bank is not a nuisance to those traveling along Second avenue or on the railroad tracks, or the street car tracks. In the establishment, since the change in 1896, fans have been used, expelling from the building all the air and escaping gases, out into the atmosphere, so that in the building itself there are no offensive odors at any time, except when the fresh garbage is brought in. The garbage is brought in and put into a pit, where foreign substances, like bottles, cans and things of that kind, are picked out, and it is then conducted by a conduit up to the digester, and put into the digester. When the garbage remains in the pit for any length of time, an hour or so, there is a very considerable quantity of offensive odors escaping from that garbage. They go into the building and are expelled from the building into the atmosphere by the fans.

5. There is occasionally on the bluff an offensive odor from the establishment. It does not arise from the boiling process; does not arise from the dry residuum that comes out. It comes from the offensive odors from the garbage, before it is put into the digester; and, by being driven out of the building with the warm air in the building, when the wind is blowing from the furnace towards the bluff these offensive odors are occasionally quite distinct and manifest on the bluff. There are other large factories and establishments along the river, on both sides of the river, that contribute to the offensive gases or odors up on the bluff when the wind is blowing in that direction. In June of 1896 a large amount of garbage and refuse, consisting of partially burned canned goods and groceries, from the wholesale grocery establishment of T. C. Jenkins & Co., that was destroyed by fire, was hauled by wagon loads, and dumped out on a portion of the railroad yard near this factory. That remained there on the ground giving out a fearful stench for some weeks, and it no doubt affected the offensive odors upon the bluff during that time.

The witnesses who testified for the plaintiffs, living on the bluff, attributed all the offensive smells and odors up there to this garbage furnace, and some of them, who kept records of

the days when it was so very offensive, spoke about its being on some Sabbath days, and testified that the vapors came out of the smoke stack of the furnace, and that the garbage furnace was working on that day. They were mistaken, because the factory never was worked on the Sabbath day, and the odors and gases that escaped after passing through the incinerating furnace did not enter the smokestack, but escaped through a separate pipe at the top of the building. Some of them also testified that their imaginations contributed to their sensations from these escaping vapors.

6. If the garbage is not permitted to remain in the pit after it is hauled, but is at once conducted into the digesters, there would be little or no offensive odor in the building, or that could escape from the building. The evidence would indicate that at some times garbage was permitted to remain in the pit for two or three hours, perhaps sometimes even longer than that. During that time the offensive odors would accumulate in the buildings, and the fans would expel them from the buildings, and, with the heated air, they would rise up to the bluff, when the wind was in that direction. This accounts for the offensive odors occasionally noticed by those on the bluff, and, if the process should be remedied in these respects there would be little, if any, offensive odor or gas escaping from the building up to the bluff.

### CONCLUSIONS OF LAW.

It is the duty of a large city like Pittsburg to make provision for gathering and disposing of the garbage of the city; it is indispensable to the health and comfort of the citizens. There is difficulty in finding a proper place for the disposal of the garbage of Pittsburg. There is no place within twenty miles of the city, on any of the rivers, where the garbage could be disposed of in the ordinary way without being regarded a nuisance in that locality; or no point within twenty miles of the city on any of the railroads where the garbage could be disposed of without being regarded a nuisance. To haul out the garbage by wagons into some remote portion of the county would be exceedingly expensive to the city; and perhaps no locality in the county could be got where it would not cause trouble. It is a serious question for a city located as we are,

and yet it is the duty of the city to provide in some way for disposing of the garbage.

No doubt the city has the right to dispose of that garbage within the city limits, as provided by the ordinance, if a suitable place can be got. The location of this garbage furnace is, perhaps, in the most unobjectionable place that could be selected within the city limits. There is no evidence to the contrary. In selecting a place for a garbage furnace, a reasonable discretion must be allowed to the city authorities. There is no doubt that a garbage furnace anywhere may be to some extent a nuisance to citizens in that locality. As one witness in the case testified, the very thought of a garbage furnace will be an annoyance. So any large establishment, factory, rolling mill, furnace, glass works, and all these other large establishments, will be, to a certain extent, an annoyance to property holders in the immediate vicinity, and, in many cases, may even depreciate the value of property in the vicinity. These inconveniences and annoyances that some citizens may suffer are simply the incidents resulting from the growth and business of a large city. This furnace is constructed on the most scientific principles, and is far superior to ordinary garbage furnaces. The bluff where these complainants live was, some years ago, probably the most delightful place about the city for residences, overlooking the Monongahela river and the hills beyond, a high bluff bank, almost perpendicular; but, in the growth of the city, factories and furnaces have been established along the bank of the river, and no doubt will increase with the years, and the smoke from these, the noise, the steam, the smells, and the offensive odors from them, will affect the bluff as a place of residence. But, the onward march of the business of the city cannot be arrested because it may be an annoyance to some of those living on the bluff. In the course of a few years it will not be, perhaps, a desirable place for residences. It is just like many other portions of the city; years ago, the lower part of the city, on Penn avenue, was the most delightful portion of the city for residences. In consequence of the large iron establishments and others, it has almost ceased to be a place of residence; property for residences has depreciated in value, and the desirable places for residences are out in the suburbs of the city. The mere fact that those residing on the bluff are

annoyed some little by the fact that a garbage furnace is down on the bank, and, some little annoyed, perhaps by the hot air that escapes from the building, does not make this a public nuisance. The offensive odors on the bluff arose from the garbage remaining too long in the pit. If the garbage brought into this furnace should be, at once, put into the digesters, and they kept tight, I believe there would be no offensive odors escaping from the garbage even in the building, and none, of course, to any appreciable extent, could extend up the bluff.

The contract with the defendant was made by the director of the department of public safety, and approved by councils and the mayor, and is only for four years. If, at the end of that period of time, only a year or so hence, this factory should be found to be a nuisance, the city authorities will not continue it, or, if they attempt to continue it then, there may be an effort made to stop it. It cannot be continued without the consent of councils and the mayor. It will not be any serious injury to these complainants to let this factory run on for the length of time provided for under the present contract, if the garbage be at once put into the digesters. Of course the city cannot authorize or sanction a public nuisance. Under the testimony of the director of the department of public safety and the officers of the bureau of health, I do not feel authorized to suppress this garbage furnace at this time, which would result, of course, in a great loss to the defendant. If the causes of the offensive odors, as stated in my findings, cannot be removed, it will be the duty of the director of the department of public safety and of the officers of the bureau of health to stop this furnace, because the ordinance requires it to be conducted in a sanitary manner. It is their duty to visit it frequently, inspect it, and hear any complaints of the citizens on the subject; and, unless it can be conducted in a manner that will not be offensive to the neighborhood, or to the complainants living on the bluff, it would not be proper for the director of the department of public safety to renew this contract with the defendant, but he should make some other provision for disposing of the garbage of the city.

Let a decree be drawn requiring the defendant to dispose of the garbage as soon and as fast as it is brought to the pit, and at once conduct it into the digesters, they to be kept tight, and

the residuum to be shipped off as speedily as possible; the defendant, Charles E. Flinn, to pay the costs. William Flinn and Philip Flinn, having no interest in the establishment, as to them the bill is dismissed.

*Error assigned* among others was the decree of the court.

*J. M. Stoner,* with him *W. G. Negley,* for appellants.—If there were other establishments from which bad smells may or do come it would not excuse the defendant for a similar wrong: Meigs v. Lister, 23 N. J. Eq. 199.

A suitable place is not one which may be convenient to the owner of the garbage furnace, looking at his interest, nor, we apprehend, convenient to the city; but one suitable and convenient when the interests of the others are considered: Bamford v. Turnley, 3 B. & S. 65; St. Helen's Smelting Co. v. Tipping, 11 H. of L. Cases, 642; Fertilizer Co. v. Malone, 9 Lawyers' Rep. Ann. 737; Penna. Lead Co.'s App., 96 Pa. 123; Rodenhausen v. Craven, 141 Pa. 546.

The plaintiffs are not bound to point out a more suitable place, even though it be necessary that the city of Pittsburg should have some place to dispose of its garbage: Meigs v. Lister, 23 N. J. Eq. 199; Stoddard v. Saratoga Springs, 127 N. Y. 261; Seifert v. Brooklyn, 101 N. Y. 136; Ashley v. Port Huron, 35 Mich. 296; Jacksonville v. Lambert, 62 Ill. 519; Woodward v. Worcester, 121 Mass. 245.

Neither can the city of Pittsburg, nor the legislature, impose on the plaintiffs, or legalize, a nuisance: Com. v. Harris, 10 W. N. C. 10; Davis v. Lambertson, 56 Barb. 487; Gas Co. v. Murphy, 39 Pa. 257; Rogers v. Traction Co., 182 Pa. 473.

The plaintiffs had a right to pure untainted, uncontaminated, inoffensive air, at least as pure as it may be consistent with the compact nature of the community in which they lived: Rhodes v. Dunbar, 57 Pa. 274; Bigler v. Pa. Canal Co., 177 Pa. 36.

On the whole case we submit that the plaintiffs should have had an injunction as prayed for: Evans v. Fertilizing Co., 160 Pa. 222; Rodenhausen v. Craven, 141 Pa. 546; Com. v. Van Sickle, Brightly's Rep. 69; Wier's App., 74 Pa. 230; Penna. Lead Co.'s App., 96 Pa. 123; Czarniecki's App., 35 P. L. J. 153.

*J. H. White*, with him *Clarence Burleigh* and *S. W. Childs*, for appellee.—The findings of the court, under the new equity rules, will not be set aside in the Supreme Court except for clear error, even where the testimony is conflicting and the merits may appear contrary to the court's conclusion: Com. v. Stevens, 178 Pa. 561; Brotherton v. Reynolds, 164 Pa. 139; Citizens Pass. Ry. v. East Harrisburg Ry., 164 Pa. 282; Stocker v. Hutter, 134 Pa. 23.

Appellees are performing a quasi municipal function and a public duty: Thomson's Pittsburgh Digest, p. 145, et seq.

Defendant's furnace is located by the proper municipal authorities.

The bill filed in this case neither directly nor indirectly complains of the hauling or depositing of garbage to defendant's factory, or of its presence there.

Great caution is exercised in interfering with establishments and erections which tend to promote public convenience: 1 High on Injunction, sec. 787; Barnes v. Calhoun, 2 Ired. Eq. 199; Attorney General v. Perkins, 2 Dev. Eq. 38; Green v. Lake, 54 Miss. 540; Gilbert v. Showerman, 23 Mich. 448; Adams v. Michael, 38 Md. 123.

PER CURIAM, January 3, 1899:

An examination of the testimony in this case has convinced us that the findings of fact and conclusions of law contained in the opinion of the learned court below are entirely correct. We do not think it necessary to discuss them in detail, we could not add to their effect by repeating them, and we therefore affirm the decree on the opinion of the court.

Decree affirmed and appeal dismissed at the cost of the appellants.